IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

PROPERTIES L. BANETTE,           )
                                 )
            Plaintiff,           )    TC-MD 130284D
                                 )
      v.                         )
                                 )
CLACKAMAS COUNTY ASSESSOR,       )
                                 )
            Defendant.           )    **FINAL DECISION**

The court entered its Decision, signed by Presiding Magistrate Tanner, in the above-entitled matter on May 12, 2014. The court did not receive a request for an award of costs and disbursements (TCR-MD 19) within 14 days after its Decision was entered. The court's Final Decision incorporates its Decision without change.

Plaintiff appeals the real market value and real market exception value of property identified as Account 00235766 (subject property) for the 2012-13 tax year. A trial was held in the courtroom of the Oregon Tax Court on February 3, 2014, in Salem, Oregon. Jack L. Orchard, Attorney at Law, appeared on behalf of Plaintiff. Eric Shoemaker (Shoemaker), developer and land use consultant, testified on behalf of Plaintiff. Kathleen J. Rastetter, Senior Clackamas County Counsel, appeared on behalf of Defendant. Ronald R. Saunders (Saunders), registered appraiser, testified on behalf of Defendant. No exhibits were received from Plaintiff. Defendant's Exhibit A was received without objection.

Plaintiff's representative stated that the parties agree that the 2012-13 subject property's real market value was $9,700,000 and the 2011-12 land real market value was $3,800,973. (Def's Ex A at 3, 94.) Plaintiff's representative stated that Plaintiff agrees the 2012-13 real market exception value is the difference between the 2011-12 real market value and 2012-13 real

market value. Plaintiff disputes Defendant's 2011-12 improvement real market value in the amount of $1,184,068. (Def's Ex A at 94.) Plaintiff disputes Defendant's 2012-13 real market exception value (exception value) in the amount of $5,000,000. (*Id.*)

Defendant's trial motion to dismiss offered at the conclusion of Plaintiff's case was denied.

## I. STATEMENT OF FACTS

Shoemaker testified that the subject property, also known as Lake Grove Village, was completed in late 1962 or early 1963. The parties agree that the subject property currently has three one-story buildings that Shoemaker testified was a "grocery-drug retail center" located on a "bull's-eye corner" (Bryant Road and Boones Ferry Road in Lake Grove), with adequate "parking" and "classic" neighborhood demographics. Shoemaker testified that two "national" businesses, Starbucks and Rite-Aid, were long-term tenants. Saunders testified that the subject property's "gross leasable area is 38,944 square feet" and the current anchor tenants are Zupan's (18,530 square feet) and Rite-Aid (5,579 square feet). (Def's Ex A at 16.)

Shoemaker testified that the subject property's "repurposing" and "rehabilitation" was started in 2011, explaining that the decision by a grocery tenant not to renew its lease provided Plaintiff with an opportunity to "refurbish" the "older but functional" subject property. He testified that there was no doubt that the subject property would remain anchored by a grocery store because Plaintiff received four unsolicited inquiries from grocers interested in leasing the vacated space. Shoemaker described in detail the changes that were made to the existing buildings including replacement of load bearing walls ("back wall and two cuts in front; 85 percent kept"), installation of covered pedestrian walkways to a second paved parking area ("connect indoor/outdoor space to 40-50 new parking spaces"), "storm water facility was

installed," "new store front systems" for all buildings except "Starbucks and Rite-Aid," increase in the roof height for the new grocery tenant ("14 foot to 18 foot clear; more natural light"), extensive electrical amperage upgrade, and how existing material was recycled for the refurbished buildings. Shoemaker testified that there were no changes made to the space occupied by Starbucks and Rite-Aid. The project was substantially complete as of January 1, 2012. In response to questions, Shoemaker testified that "$6.8 million was spent on the refurbishing" and approximately "90 percent" was completed as of January 1, 2012. He testified that it was "not necessary to spend $6.8 million to retain existing tenants;" the goal was to "restore the value of the asset and not worry about it for another 20 years." Shoemaker testified that there was "$500,000 excess soft costs" and Plaintiff was "generous with the restaurants," specifically tenant improvements. Saunders testified that "in his experience a property owner could not spend $6.8 million for completed costs to receive $2 million in additional value. It would be better to sell, take the money and invest it."

Shoemaker testified that in his opinion the subject property's 2011-12 real market value was "eight to nine million," stating land real market value was $5 million and improvements "three to four million." He testified that Defendant's 2011-12 real market value is "flatly wrong" and is "artificially low." Shoemaker testified that Defendant's 2011-12 improvement real market value "does not account for the inherent value in the buildings that were not new but not falling over." He testified that a $75 to $100 price per square-foot for the improvement real market value as of January 1, 2011, was an "as is basis" and when added to the land real market value of $3.8 million would result in a total real market value of approximately $7.6 million. Shoemaker testified that the 2012-13 exception value should be no more than $2.5 million. In response to questions, Shoemaker testified that as of January 1, 2011, a letter of intent had been signed with

the new grocery tenant and leases for two restaurants were "largely baked." He testified that it "was a managed liquidation of tenants" during 2011.

Saunders testified that he has been "an appraiser for more than 30 years" and appraised "in excess of 5,000 commercial properties." Saunders reviewed his appraisal report, supporting his determination of the subject property's 2012-13 real market value of $9,700,000 and exception value of $5,000,000. (Def's Ex A at 3.) Saunders testified that he concluded the subject property's highest and best use was commercial and that its existing developed use was its highest and best use.

Saunders testified that he considered all three valuation approaches (cost, sales comparison and income) and concluded that the cost approach "was not relied upon * * * due to the age of the improvements and the difficulty in estimating accrued depreciation." (*Id*. at 56.) Saunders testified that after considering four land sales occurring between February, 2008 and March, 2011 and ranging from $24.89 to $43.18 per square-foot, he concluded that the subject property's 2011-12 and 2012-13 real market land value was $3,800,973, stating that "[t]here has been no change in land values between 1/1/11 and 1/1/12." (*Id*. at 58-59, 79.) He testified that he added "an additional 13% for indirect costs" or $575,905 for a total 2012-13 real market land value of $4,376,818. (*Id*. at 59.)

"In estimating the value of the subject property by the Sales Comparison Approach, research was conducted in the Portland metropolitan area to locate sales of similar shopping center properties with which to compare the subject property." (*Id*. at 60.) Saunders stated that for tax year 2012-13:

> "The [four] sales occurred between June 2010 and August 2010. They range in gross leasable area from 35,392 SF [square feet] to 123,922 SF GLA [gross lease area]. The unadjusted price per SF ranges from $108.29 to $327.76 SF.

"* * *

"The four sales all required several adjustments and indicate a unit price range for the subject property of substantially more than $180.29 per SF by sale 4, substantially more than $190.05 per SF by sale 1, less than $327.76 per SF by sale 2 and less than $326.79 per SF by sale 3. * * * The estimated value of the * * * subject property * * * is $10,203,486."

(*Id*. at 60- 61.)  For the 2011-12 tax year, Saunders stated that:

"The [four] sales occurred between January 2008 and August 2011.  They range in gross building area from 11,885 SF to 28,472 SF GLA.  The unadjusted price per SF ranges from $103.70 to $150.15 SF GLA.  The four sales used in this section occurred before the date of valuation and were used to show the market for the subject property, trends and pertinent valuation indicators. * * * These sales are compared to the subject property which contains 39,547 SF GLA.  It was constructed in 1961 and had not been previously remodeled.  The site area contained 136,016 SF and the land to building ratio was 3.44 to 1.   There were 155 open asphalt parking spaces which is 3.92 spaces per 1,000 SF GLA.  The improvements were nearing the end of their economic life according to Mr. Eric Shoemaker, the plaintiff's representative, who estimated that there was $2 million in deferred maintenance that needed to be cured.  The subject property was 19.2% occupied by three tenants."

"* * *

"The four sales all required several adjustments and indicate a unit price range for the subject property of substantially more than $103.70 per SF by sale 4, slightly less than $150.00 per SF by sale 3, and more than $133.70 and more than $131.25 per SF by sales 1 and 2, respectively.  Most weight was placed upon sale 3 which is most similar in size but newer in age, higher occupancy, superior in condition and inferior in location with further support by the other sales. * * * The estimated value * * * of the subject property * * * is $4,985,041 [including land real market value of $3,800,973] as of January 1, 2011."

(Id. at 77-79.)  Saunders stated that the "income approach measures the value of an income producing property based on the property's income producing ability.  The direct capitalization approach will be used."  (*Id*. at 65.)  Saunders selected eight "comparable leases" for the 2012-13 tax year that were "compared on a dollar per square foot per year unit of comparison, on a triple net lease basis which reflects typical market behavior."  Saunders stated:

/ / /

"The shop space lease comparables (#1 - #5) range from May 2010 to December 2011 in date signed with four to ten year terms. The initial rent ranges from $26 to $29 per SF with no free rent and $8 to $11 TI [tenant improvement] allowances on second generation space. The average estimated market rent is $28.00 per SF for the subject's smaller shop space under 5,000 SF and $24 per SF for the subject's (Rite-Aid) shop space which is over 5,000 SF in size. These rent estimates are supported by the recently signed pre-leases in the center which range from $16.50 to $29.33 per SF.

"The grocery store leases range from 24,000 to 41,300 SF in size, from August of 2006 to November of 2011 and from $10.00 to $21.00 per SF in rent. There is no free rent and TI allowances range from none to $10.00 per SF. * * * The subject's space had a lease signed in November 2011 for $16.50 per SF which falls in this range and is judged to be market rent.

"* * * * *

"The estimated potential gross annual income for the subject property as of January 1, 2012 is $855,021 or $21.96 per SF."

(*Id*. at 73.) Saunders testified that he concluded a "5 % vacancy rate" and estimated annual operating expenses to be "4 %" resulting in an "estimated annual net operating income of $779,779." (*Id*. at 74.) He testified that using "the four comparable sales in the prior sales comparison approach * * * he concluded that the subject property "would sell at an overall rate of 7%." (*Id*.) Saunders testified that "[w]hen the estimated net annual operating income of $779,779 is divided by an overall capitalization rate of 7.0%" and adjusted for "remodeling costs remaining to be spent" the "indicated market value of the fee simple interest in the subject property * * * is $9,659,986" as of January 1, 2012. (*Id*. at 75.)

For the 2011-12 tax year, Saunders stated that:

"The shop space lease comparables (#1-6) ranged from September 2008 to April 2011 in date signed all with five year terms. The initial rent ranges were from $13.00 for a unit with no arterial exposure to $20.00 for SF for a unit with good arterial exposure that had received some remodeling. Concessions ranged from none for five leases to equivalent to three and a half months free for one lease. There were no TI allowances and annual escalation clauses ranged from none to 3% per year. The market rent is estimated to be $17.00 per SF for the subject's

smaller shop space under 5,000 SF and $15.00 per SF for the subject's (Rite-Aid) shop space which is over 5,000 SF in size.

"The large retail leases for the subject's anchor store range from 20,000 to 34,370 SF in size, from October 2011 to November of 2011 in date signed and from $8.00 to $8.20 per SF in rent. There is no free rent, no TI allowances and annual escalation ranging from 3% per year to step increases. * * * It is the appraiser's opinion that the subject's 20.733 SF anchor space would lease for $10.00 per SF in comparison.

"* * *

"The estimated potential gross annual income for the subject property as of January 1, 2011 is $515,730 or $13.04 per SF."

(*Id*. at 91-92.) Saunders testified that he concluded an "8 % vacancy rate" and estimated annual operating expenses to be "6 %," resulting in an "estimated annual net operating income [of] $446,004." (*Id*. at 92.) He testified that "[g]iving consideration to the overall rate indications from all four [comparable] sales" he concluded that the subject property "would sell at an overall rate of 8.5%." (*Id*. at 93.) Saunders testified that "when the estimated net annual operating income of $446,004 is divided by an overall capitalization rate of 8.5%, the indicated market value of the fee simple interest in the subject property is * * * $4,695,567 as of January 1, 2011." (*Id*.) In response to questions, Saunders stated that the 2011-12 land real market value was $3,800,973 and the improvement real market value was $894,594. In response to questions, Saunders acknowledged that sale #4 was "after the valuation date" and was "a one-story retail building consisting of both retail and office users" with 14,947 square feet of gross lease area and was not a grocery-drug retail center. (*Id*. at 78.)

Saunders testified that "[a]fter considering factors relevant to the valuation of the subject property and the quality of available data for analysis, most weight was placed on the value indication from the income approach, which indicated a market value estimate of the fee simple interest in the subject property as of January 1, 2012 of $9,700,000. The estimated exception

value is the difference in market value between January 1, 2012 of $9,700,000 and January 1, 2011 of $4,700,000, which is $5,000,000." (*Id*. at 94.) Saunders stated in his appraisal report:

> "According to information provided by the property owner's representative, approximately $5,676,000 was spent on the overall shopping center property as of January 1, 2012. The actual costs included approximately $300,000 in demolition costs and $104,175 in site improvements for tax lot 3100 [not before the court] leaving $5,271,825 as of January 1, 2012. Actual costs provide additional support to the   reasonableness of the appraiser's exception value estimate of $5,000,000 as of January 1, 2012."

(*Id*. at 94-95.) In response to questions, Saunders testified that he did not inspect the subject property until 2013. Saunders testified that in making his determination of real market value he did not "focus on what portion of the existing improvements were retained" as part of the subject property's completed refurbishment. He testified that if he had considered the "actual leases of Rite Aid and Starbucks which were below rates," he would have determined a "lower value of lease fee."

## II.  ANALYSIS

The only issue before the court is the 2012-13 exception value of Plaintiffs' property. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor*, TC-MD No 020869D, WL 21263620 at \*2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1), which reads: "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."[1] The assessment date for the 2012-13 tax year was January 1, 2012. ORS 308.007(2).

---

[1] The court's references to the Oregon Revised Statutes (ORS) are to 2011.

The parties agree the subject property's 2012-13 exception value is the difference between the subject property's 2011-12 real market value and 2012-13 real market value.[2] Plaintiffs stated that they accept Defendant's 2012-13 real market value of $9,700,000 which includes real market land value of $4,376,818 and real market improvement value of $5,323,182. (Def's Ex A at 17.) Plaintiffs did not appeal the subject property's 2011-12 real market value. Plaintiffs' Complaint listed the 2012-13 tax year as the year appealed. The fact that the 2012-13 exception value is before the court does not automatically open the door for the court to determine the subject property's 2011-12 real market value. That tax year is closed unless Plaintiffs can meet the statutory requirements of ORS 305.288(3), showing good and sufficient cause for failing to exercise their statutory right of appeal for the 2011-12 tax year. Plaintiffs have not made a claim that ORS 305.288(3) is applicable and offered no evidence to show good and sufficient cause for failing to appeal the subject property's 2011-12 real market value. Plaintiffs cite no statutory authority for the court to determine the subject property's 2011-12 real market value.

A.    *Burden of Proof*

As the party seeking affirmative relief, Plaintiff bears the burden of proving that the subject property's real market value is incorrect on the tax roll. ORS 305.427. Plaintiff must establish his claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence." *Schaefer v. Dept. of Rev.*, TC No 4530, WL 914208 *2 (Jul 12, 2001) (*citing Feves v. Dept. of Revenue*, 4 OTR 302 (1971)). This court has stated that "it is not

---

[2] The court notes that the exception value of a property "is the amount by which the RMV [real market value] of the new improvements to it exceeds the RMV of any retirements. ORS 308.153(2)(a)." *Magno v. Dept. of Rev.*, 19 OTR 51, 62-63 (2006). The parties' stipulation that exception value is the difference between the subject property's real market value stated on the tax roll for the year prior to the subject property's refurbishing and the subject property's real market value after the refurbishing may or may not meet the statutory requirements; the parties submitted no evidence for the court to consider.

enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept of Rev.*, 18 OTR 324, 332 (2005) (*quoting Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002) (citation omitted)). "Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor*, TC-MD No 110300D at 7 (Mar 13, 2012). Evidence that is inconclusive or unpersuasive is insufficient to sustain the burden of proof. *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990).

Assuming that there was statutory authority for the court to determine the subject property's 2011-12 real market value, Plaintiffs did not determine the subject property's 2011-12 real market value using any of the three approaches of value. There are three approaches to valuation (income, cost, and sales comparison) that must be considered when determining the real market value of a property. *Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003); *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995); *see also* OAR 150-308.205-(A)(2)(a). All three approaches must be considered, although all three approaches may not be applicable to the valuation of the subject property. OAR 150-308.205-(A)(2)(a). The valuation approach to be used is a question of fact to be determined on the record. *Pacific Power & Light Co. v. Dept. of Revenue*, 286 Or 529, 533, 596 P2d 912 (1979). The real market value of property "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2).

Plaintiffs relied on the testimony of Shoemaker, an experienced broker with development expertise. Shoemaker testified that the 2011-12 real market land value was "$5 million" but later Plaintiffs agreed that Defendant's 2011-12 real market land value of $3,800,973 was correct.

Plaintiffs offered no evidence to support Shoemaker's 2011-12 real market land value of $5 million. Shoemaker testified that the subject property's real market improvement value as of January 1, 2011, was "three to four million." Shoemaker offered no evidence other than his own testimony to support his value determination. As of January 1, 2011, the subject property was not "repurposed" or "refurbished." There is no evidence that a willing buyer would pay more for the subject property prior to the refurbishing than the real market value determined by Saunders using the income approach. There was no evidence that a willing buyer would pay a purchase price in excess of a real market value determined by Defendant's income approach (gross potential income is supported by revenue generated by existing leases) knowing that additional costs to "refurbish" or "repurpose" the subject property would need to be incurred to secure new tenants who were willing to pay higher rents. (Def's Ex A at 91-92.) Plaintiffs offered no evidence to the contrary. Other than Shoemaker's personal opinion, no other evidence was offered to support Plaintiffs' determination of value and contrary evidence rebuts Shoemaker's determination.

Plaintiffs failed to provide statutory authority that the court can determine the subject property's 2011-12 real market value. Even if the court had statutory authority to determine the subject property's 2011-12 real market value, Plaintiffs failed to submit adequate evidence for their requested 2011-12 real market value. Plaintiffs' requested 2012-13 exception value is unproven.

B.    *Defendant's Evidence*

The court finds that Plaintiffs did not meet their burden of proof to support the requested subject property's 2011-12 real market value and 2012-12 exception value. Even though Plaintiffs failed to carry their burden of proof and "the burden of going forward with the

evidence" has not shifted, the court has jurisdiction to determine the "real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.427; ORS 305.412. Defendant's evidence is now considered.

Saunders concluded that for each of the tax years (2011-12 and 2012-13) the subject property's real market value should be more than was stated on the tax roll (2011-12 tax year) and determined by the Clackamas County Board of Property Tax Appeals (2012-13 tax year). Plaintiffs only appealed the 2012-13 tax year and Defendant did not file an appeal or counterclaim challenging the subject property's 2011-12 real market value. The court cannot consider Defendant's evidence challenging the subject property's 2011-12 real market tax roll value because it is not properly before the court. The court need not consider Defendant's evidence of the subject property's 2012-13 real market value because Plaintiffs accepted Defendant's determination.

III. CONCLUSION

After careful review of the testimony and evidence, the court concludes that Plaintiffs failed to carry their burden of proof. Plaintiffs accepted Defendant's determination of the subject property's 2012-13 real market value. That value was in excess of the Clackamas County Board of Property Tax Appeals determination of real market value ($8,260,508). The parties agreed that the 2012-13 exception value is the difference between the subject property's 2011-12 real market value ($4,324,469) and the 2012-13 real market value ($9,700,000) or $5,375,531. (Def's Ex D at 1.) Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is denied.

/ / /

/ / /

IT IS FURTHER DECIDED the 2012-13 real market values for property identified as

Account 00235766 are:

Real market value:  $9,700,000; and

Real market exception value:  $5,375,531.

Dated this ___ day of May 2014.


_____
ALLISON R. BOOMER
MAGISTRATE

***If you want to appeal this Final Decision, file a Complaint in the Regular
Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR
97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.***

***Your Complaint must be submitted within <u>60</u> days after the date of the Final
Decision or this Final Decision cannot be changed.***

***This document was signed by Magistrate Allison R. Boomer on May 30, 2014.
The court filed and entered this document on May 30, 2014.***